[Cite as *State v. Warren*, 2015-Ohio-3671.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 102181

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DESMOND ERIC WARREN

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585539-A

**BEFORE:** E.A. Gallagher, J., Celebrezze, A.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 10, 2015

**ATTORNEY FOR APPELLANT**

Erin R. Flanagan
75 Public Square
Suite 305
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Melissa Riley
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

EILEEN A. GALLAGHER, J.:

**{¶1}** Defendant-appellant Desmond Eric Warren appeals his convictions from the Cuyahoga County Court of Common Pleas for trafficking in persons and compelling prostitution. Warren argues that his convictions were not supported by sufficient evidence and against the manifest weight of the evidence. For the following reasons, we affirm.

**{¶2}** On May 23, 2014 Warren was indicted for trafficking in persons, corrupting another with drugs, three counts of compelling prostitution and three counts of promoting prostitution. The case proceeded to a jury trial where the following facts were elicited.

**{¶3}** Detective Jim Scullin of the Westlake Police Department testified that Shawna Lowder was arrested for prostitution in June 2013 as a result of a prostitution sting at a local hotel. Lowder provided a fictitious name and was again arrested by Westlake police in January 2014. After the latter arrest, Lowder claimed a medical condition while in jail and was furloughed to St. John's Westshore Hospital for medical treatment. When she did not return to jail from the hospital, Scullin prepared a criminal complaint charging her with escape.

**{¶4}** Scullin tracked Lowder's cellular phone number to an advertisement posted on Backpage.com and, posing as a prospective client, arranged to meet her at a hotel in North Olmsted. Police found Lowder and another woman, Stephanie Dzugan, in two unlocked adjoining rooms at the hotel. Inside one of the rooms police found photos of Dzugan and Warren as well as men's clothing, drug paraphernalia and a condom.

Dzugan was found to be in possession of $907.

{¶5} Warren appeared at the hotel an hour or two after police arrested Lowder and Dzugan. Although Warren claimed he was coming to visit a friend, he could not provide a name or room number. Warren was arrested at that time and found to be in possession of two cell phones and $555.

{¶6} Alexis Williams testified that she was married to Warren. Williams described in detail Warren's role as a pimp in a scheme where she, Stephanie Dzugan, Asiacashe Terry and Shawna Lowder operated as prostitutes. Warren would choose a hotel and have Williams use her identification to obtain rooms. The women would post prostitution advertisements on the website Backpage.com and, after obtaining money in exchange for sex, the women would give the money to Warren. The amount of money to be charged for the prostitution services was dictated by Warren.

{¶7} Although Williams maintained that she could have refused her role in the prostitution operation, she detailed Warren's method of manipulating the women involved in the prostitution scheme. This "pimp control" was described by Williams as follows:

> It's like making a woman feel like she's number one and that you need her and that you love her, and also putting fear in her by if she's not doing what you want her to do, by either hitting her or taking that attention and love away and giving it to someone else.

{¶8} Williams testified that Warren used this manipulation on her. Despite their marriage, Warren wanted her to work as a prostitute and once she began prostituting for him he began to refer to her as a "b****" and a "ho." Williams testified that Warren

would slap her, hit her, call her names and later, make love to her.  This abuse would sometimes occur when they were alone and other times when the other women were present.

{¶9} Williams described an incident at a park with her children present where a man sat near her.  Warren didn't want her sitting near other men and, because she disobeyed him, he punched her. Later, she tried to leave their home but he punched, kicked and choked her before tying her up in their basement.

{¶10} Williams testified that Warren slapped another one of his prostitutes, Shawna Lowder, when some money was missing.  Williams also testified that Lowder was a heroin addict and Warren would provide her with heroin and marijuana.

{¶11} Warren brought prostitutes into their home to live with their family but if the women weren't working as prostitutes they were not allowed to stay in the home. Williams stated that she would collect money from the other prostitutes and provide it to Warren.  This included social security checks that belonged to Asiacashe Terry.

{¶12} Asiacashe Terry testified that she met Warren in January 2013 at a bus stop in Cuyahoga County. She was 18 years old at the time and had no place to live.  Warren took her to his home and offered to let her stay with his family.  Warren did not initially ask for anything in return but two to three days later Warren brought Terry to a hotel in Beachwood and left her with a prostitute named "London."  London explained to Terry that Warren was a pimp and that she was to call him "Daddy."  Terry learned the process of posting prostitution advertisements on Backpage.com and testified:

* * * after she told me, I kind of just gave in to it because I just thought about, well, if I decide to leave, I'm going to be back in the situation that I was in before he picked me up.

{¶13} London took pictures of Terry and posted her first advertisement to Backpage.com. After the posting, London called Warren to provide him an update. London screened Terry's calls responding to the Backpage.com advertisement and collected the money she earned from engaging in sexual conduct with clients.

{¶14} Terry testified that Warren decided how much money was to be charged for the prostitution services. Terry stated that she became a prostitute for Warren and in return, her needs were met: she had a place to live and was provided anything she wanted or needed as long as she was willing to prostitute. Warren made Terry give him the money she earned for prostitution as well as her social security benefits. Warren made Terry travel to Washington D.C. to prostitute. Terry testified that she felt she had to do what he told her to do.

{¶15} Terry testified that Warren made her feel like he cared about her and that she was important to him. At the same time, Warren had a set of rules and that if she broke a rule she would be hit or yelled at by Warren. Warren had a "no sightseeing rule" whereby Terry was not allowed to look at another male unless it was for money. When she broke this rule Warren struck her in the face with the back of his hand. Terry described another instance where Warren slapped her in the kitchen of his home.

{¶16} Terry stated that, of all the prostitutes working for Warren, Williams received the worst treatment. Warren was quick to beat Williams. Terry testified that

anything Williams did wrong would result in her being beaten. Watching Warren beat Williams made Terry feel scared and concerned that if she made a mistake she would be beaten like Williams. Terry was also scared from watching Warren beat London. Terry testified that she had sex with Warren for the first time about a week after he brought her to his home. She didn't want to have sex with him but didn't tell him "no."

{¶17} Terry testified that she feared Warren because she had witnessed how he had treated other girls and she was afraid that he would beat her. Warren told her stories about things that he had done to other girls that tried to leave him including putting a prostitute in the trunk of his car and beating and injuring her with a metal broomstick. Terry testified that Warren laughed while telling her these stories.

{¶18} Terry tried to leave Warren three times but always ended up returning because she was "stuck" due to the fact that Warren did not give her any of the money she earned from prostituting, he possessed her birth certificate and social security card and her social security checks were being sent to his home. She returned to Warren because she needed to and had no other options:

> [H]e took everything from me, to the point where if I left, I would have to come back because I needed him so much.

{¶19} In April 2013, Terry contacted law enforcement and told them she was a victim of human trafficking. She met with Detective John Morgan in Cleveland and was "sent to California." When she returned to Cleveland in January 2014, Warren appeared at her house and, despite her protestations, assumed that she would continue working for him and told her to call him when she had $500 for him.

**{¶20}** Shawna Lowder testified that she met Warren in Cleveland in 2012 or 2013 through a prostitution advertisement she posted to Backpage.com. At the time she had a warrant for her arrest in Erie County for burglary, was addicted to vicodin and opana and was homeless. She and Warren decided that she would start working for him selling sex through Backpage.com. Lowder testified that at the time she felt like Warren saved her life.

**{¶21}** Warren took her to a hotel in North Olmsted where she began working as a prostitute. Warren decided the prices she was to charge for prostitution. She would give all of her money to Warren and he would provide her with food, clothing and drugs.

**{¶22}** When Warren couldn't provide her with vicodin and opana, he introduced her to heroin. Lowder testified that she "wanted it" the first time. Lowder testified that as her addiction to heroin grew she would feel physically ill if she didn't have it. In turn, she would have to make money for Warren in order for him to provide heroin to her.

**{¶23}** Lowder worked for Warren for a year and a half to two years. Lowder testified that she worked all day, every day, servicing between two and twelve "johns" per day. Lowder testified that Warren had common sense rules such as not looking at other pimps, giving all the money to him and not being disrespectful. Lowder called Warren "Daddy." Once, when she was caught not providing Warren with all the money she had earned, he smacked her in the face.

**{¶24}** Lowder testified that it was her choice to engage in prostitution; however, if she got into trouble with Warren it would affect the amount of heroin she was receiving.

Lowder testified that she needed the heroin, was desperate to buy it and a lack of heroin would make her work harder to obtain more money for it.

**{¶25}** Lowder described the events leading up to her January 2014 arrest for prostitution with Stephanie Dzugan and Warren at a La Quinta Inn in Independence. Her arrest was made possible by her need to obtain heroin and willingness to take risks despite sensing a police sting operation.

**{¶26}** Stephanie Dzugan met Warren when she was 17 years old. She had discovered the practice of prostituting through Backpage.com advertisements prior to meeting Warren. Dzugan was present at the La Quinta Inn in January 2014 when she was arrested with Lowder. She testified that she was holding onto Lowder's money to keep it secure. Dzugan admitted to expressing feelings of love to Warren.

**{¶27}** Detective John Morgan testified to his detailed experience in law enforcement activities involving prostitution and human trafficking. He explained the concept of "pimp control" whereby a pimp fills a void in a prostitute's life. He also explained that young prostitutes learn the rules of the prostitution game from a "bottom b****" who has been with the trafficker the longest. This prostitute may take a beating in front of the other girls in order to instill fear into them.

**{¶28}** Morgan began following the internet postings of Alexis Williams after meeting Asiacashe Terry in 2013. He eventually set up a sting operation at the La Quinta Inn in North Olmsted that resulted in the arrests of Lowder, Dzugan and Warren.

**{¶29}** Warren testified in his defense and admitted to being involved in

prostitution but claimed he merely accepted money from prostitutes rather than forcing them to give him money. He denied forcing the prostitutes to work. He admitted that he bought heroin for Lowder but denied pushing her to become dependent on it.

{¶30} The jury returned verdicts of guilty for the charges of trafficking in persons, one count of compelling prostitution where the named victim was Shawna Lowder and three counts of promoting prostitution. The jury found Warren not guilty of the remaining counts as well as not guilty of a human trafficking specification attached to his sole compelling prostitution conviction.

{¶31} At sentencing, the trial court merged Warren's convictions for human trafficking and compelling prostitution as allied offenses of similar import. The trial court imposed prison terms of 14 years on the human trafficking charge and 12 months on each of the promoting prostitution charges. The sentences were ordered to be served concurrently.

{¶32} Warren presents four assignments of error that we address out of order for ease of discussion. In his first and third assignments of error Warren argues that the evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that he was guilty of trafficking in persons and compelling prostitution.

{¶33} This court has said that, in evaluating a sufficiency of the evidence argument, courts are to assess not whether the state's evidence is to be believed but whether, if believed, the evidence against a defendant would support a conviction. *State v. Givan*, 8th Dist. Cuyahoga No. 94609, 2011-Ohio-100, ¶ 13, citing *State v. Thompkins*,

78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. The relevant inquiry then is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶34} Warren was convicted of trafficking in persons in violation of R.C. 2905.32 and compelling prostitution in violation of R.C. 2907.21. The trafficking in persons statute provides in relevant part:

> (A)    No person shall knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, or knowingly attempt to recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, another person if any of the following applies:

> (1)    The offender knows that the other person will be subjected to involuntary servitude or be compelled to engage in sexual activity for hire * * * .

R.C. 2905.32.

{¶35} The state maintains that the term "compelled" should be defined to include "coercion." This is an important distinction because if the act of compelling were defined to include "coercion" the breadth of conduct encapsulated by "compel" would be significantly expanded. To illustrate the point, we cite the following passage from *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), wherein the Ohio Supreme Court examined the difference between "duress" that is unquestionably incorporated into the definition of "compel," and "coercion":

The words "coercion" and "duress" are not synonymous, although their meanings often shade into one another. "Duress" generally carries the idea of compulsion, either by means of actual physical force or threatened physical force applied to the person (or to some near relative of the person) to be influenced, or applied to the property or reputation of such person. "Coercion" may include a compulsion brought about by moral force or in some other manner with or without physical force. * * * Coercion has been found in a wife's refusal to return to her husband and resume marital relations * * *, and in an employer's warning to striking workers that if they did not return to work by a certain day their jobs would be filled.

These judicial definitions of coercion correspond to the common use of the word. Webster's Third New International Dictionary defines coercion as "the act of coercing: use of physical or moral force to compel to act or assent," and to coerce as "to restrain, control or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)."

The essential characteristic of coercion which emerges from these definitions is that force, threat of force, strong persuasion or domination by another, necessitous circumstances, or some combination of those, has overcome the mind or volition of the defendant so that he acted other than he ordinarily would have acted in the absence of those influences. (Internal citations omitted.)

*Woods* at 136-137, *overruled in part on other grounds*, *State v. Downs,* 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977).

{¶36} The state's suggestion to include "coercion" as part of the "compelled" element of trafficking in persons is based on cases that interpreted the term "compel" as it was used in other offenses where the term was not statutorily defined. For example, in *State v. Watson*, 8th Dist. Cuyahoga No. 90962, 2009-Ohio-2120, this court noted that the term compel, as used in the offense of compelling prostitution, was not defined in the statute or the Ohio Revised Code at the time. In *Watson*, this court defined the term compel by relying on legislative committee comments to R.C. 2907.21 that provided that "the compulsion used may be force or threat of force, duress, or coercion of any kind." Importantly, we note that in 2011 the legislature amended R.C. 2907.21 to define the element of "compelled" and remove "coercion" as part of that definition.

{¶37} As with the amended version of compelling prostitution, for the purposes of trafficking in persons we need not look beyond the statute for guidance in defining the element of "compelled." R.C. 2905.32(B) states:

> (B) For a prosecution under division (A)(1) of this section, the element "compelled" does not require that the compulsion be openly displayed or physically exerted. The element "compelled" has been established if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud.

{¶38} In this instance the state presented sufficient evidence that Warren recruited and maintained prostitutes with knowledge that they would be compelled to engage in sexual activity for hire. The record details a systemic use of force, fear, duress and

intimidation in Warren's prostitution scheme. Alexis Williams stated that Warren relied upon manipulation and fear of physical force to control the women. The testimony established that Warren would often beat Williams as an example to instill fear into the other women. Williams also used physical force on both Lowder and Terry to force them to comply with his rules.

{¶39} Asiacashe Terry testified that she became completely reliant upon Warren such that she became "stuck." Warren provided for all of her day-to-day needs and was receiving her social security check. If she did not prostitute for Warren she would be back out on the street. Williams' testimony corroborated this fact: if the women weren't working as prostitutes they were not allowed to stay in Warren's home. Terry also described the fear instilled in her from watching Warren beat Williams and listening to Warren describe physically abusing other prostitutes that tried to leave him.

{¶40} Finally, Lowder described how Warren enabled her increasing drug addiction in exchange for working as a prostitute for him. Warren introduced Lowder to heroin and manipulated her physical dependence on the drug to accomplish his will. In fact, it was Lowder's desperation to make money to obtain heroin from Warren that led to the downfall of Warren's prostitution ring.

{¶41} On these facts, we find that the state presented sufficient evidence to support Warren's conviction for trafficking in persons.

{¶42} Warren also argues that his conviction for compelling prostitution was not supported by sufficient evidence. R.C. 2907.21(A)(1) defines compelling prostitution as

follows:

> (A) No person shall knowingly do any of the following:
>
> (1) Compel another to engage in sexual activity for hire;
>
> * * *
>
> (B) For a prosecution under division (A)(1) of this section, the element "compel" does not require that the compulsion be openly displayed or physically exerted. The element "compel" has been established if the state proves that the victim's will was overcome by force, fear, duress, or intimidation.

**{¶43}** We again note that R.C. 2907.21 was amended in 2011 to provide a statutory definition for the term "compel" in section (B) which supersedes the definition this court provided in *State v. Watson*, 8th Dist. Cuyahoga No. 90962, 2009-Ohio-2120.

**{¶44}** Consistent with our analysis above, the testimony established Warren introduced Lowder to heroin and manipulated her drug addiction to motivate her to engage in prostitution in order to provide him with money in exchange for heroin. Furthermore, Williams testified that Warren exerted physical violence on Lowder when she was missing prostitution-related money. Lowder's testimony confirmed that Williams struck her for withholding money. Lowder's compliance with Warren's rules was accomplished both by his control of her heroin supply as well as physical violence.

**{¶45}** We find that the state presented sufficient evidence to support Warren's conviction for compelling prostitution.

**{¶46}** Warren's first and third assignments of error are overruled.

**{¶47}** In his second and fourth assignments of error Warren argues that his

convictions for trafficking in persons and compelling prostitution were against the manifest weight of the evidence.

{¶48} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence.

{¶49} "When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree "'with the factfinder's resolution of conflicting testimony.'" *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and

two of the syllabus. Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *Martin*, *supra*.

{¶50} With respect to his human trafficking conviction Warren challenges the credibility of Alexis Williams and attempts to place the blame for the prostitution scheme on her. We are mindful that the weight to be given the evidence and the credibility of the witnesses are matters primarily for the trier of fact. *DeHass*, paragraph one of the syllabus. While Williams' credibility was susceptible to a challenge, the jury was in the best position to weigh her credibility and evaluate her testimony under a thorough cross-examination by Warren's trial counsel. Furthermore, Williams' testimony was largely consistent with the testimony provided by Terry and Lowder.

{¶51} Warren's argument that his conviction for compelling prostitution as to Lowder is simply a reiteration of the previously rejected arguments he presented in his third assignment of error.

{¶52} Finally, we note that the state introduced exhibit No. 4 to establish Warren's prior convictions for pandering and living from the earnings of a prostitute in the state of Nevada. This is permissible pursuant to R.C. 2907.26(C). However, the exhibit about which Detective Scullin testified consisted of a computer generated printout purportedly from the Clark County, Nevada court website. Its provenance was never established and it was not authenticated. This printout does not qualify as a certified copy of a public record such that it was exempt from extrinsic evidence of authenticity pursuant to Evid.R.

902(4).   Nor did the state offer any such extrinsic evidence for the purposes of authentication.   The exhibit's admission was error, but the error was harmless in this particular case.

**{¶53}** Warren's second and fourth assignments of error are overruled.

**{¶54}** The judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

FRANK D. CELEBREZZE, JR., A.J., and
SEAN C. GALLAGHER, J., CONCUR